Andrew N. Friedman (DC Bar 375595)
Victoria S. Nugent (DC Bar 470800)
Julie Selesnick (DC Bar 485558)
Geoffrey Graber (*pro hac vice forthcoming*)
Eric Kafka (*pro hac vice forthcoming*)
Karina G. Puttieva (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
vnugent@cohenmilstein.com
jselesnick@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com
kputtieva@cohenmilstein.com

Eric H. Gibbs (*pro hac vice forthcoming*)
ehg@classlawgroup.com
Andre M. Mura (DC Bar 492837)
amm@classlawgroup.com
Karen Barth Menzies (*pro hac vice forthcoming*)
kbm@classlawgroup.com
Amy M. Zeman (*pro hac vice forthcoming*)
amz@classlawgroup.com
Steve Lopez (*pro hac vice forthcoming*)
sal@classlawgroup.com
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

*Counsel for Plaintiff and Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GCDC LLC d/b/a GCDC GRILLED CHEESE BAR, individually, and on behalf of others similarly situated,<br>1730 Pennsylvania Ave. NW<br>Washington, D.C. 20006<br><br>Plaintiff,<br><br>v.<br><br>THE HARTFORD FINANCIAL SERVICES GROUP, INC., a corporation, AND SENTINEL INSURANCE COMPANY, LTD a corporation,<br>One Hartford Plaza,<br>Hartford, CT 06155<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff GCDC LLC, d/b/a GCDC Grilled Cheese Bar, individually and on behalf of all others similarly situated, hereby files suit against The Hartford Financial Services Group, Inc., and Sentinel Insurance Company, Ltd. ("Defendants"), and alleges the following.

### INTRODUCTION

1.      The globe, the nation, and the District of Columbia are fighting the COVID-19 pandemic.  The counter-measures necessary to combat this pandemic are extreme – requiring the closure of many businesses and restricting almost all public activities.

2.      Restaurants, in particular, have suffered immediate and precipitous losses.  This impact on restaurants will have a devastating impact on the nation's economy and social life. As of 2016, Americans spend more than half of their food budget eating outside the home. According to The Brookings Institution, food preparation and service is the second most common occupation in the United States; waiting tables is the eighth most common.  At the start of 2020, there were more than 12 million Americans working at over 600,000 food service and drinking establishments nationwide. *Food & Wine* reports that approximately 8 million restaurant workers have been laid-off or furloughed since mid-March.  Before the COVID-19 pandemic materialized, the National Restaurant Association predicted 2020 sales would be $899 billion.  The latest estimates suggest the industry will face $240 billion in losses by the end of the year.  Those losses include an estimated $30-plus billion in lost revenue in March and a projected $50-plus billion in lost revenue in April alone.

3.      The restaurant industry is vital to the local economy of Washington, D.C.  In 2018, the District's 2,457 restaurants and bars generated $4 billion in sales.  In 2019, about 8 percent of all employment in the District — 65,200 jobs — was in the restaurant and food

service industry.  According to the Washington *City Paper*, small, independent restaurants make up 96 percent of the District's dining scene.  Government-mandated business restrictions are taking a devastating economic toll on these small businesses.

4.      Plaintiff GCDG Grilled Cheese Bar ("GCDC"), a popular, well-reviewed eatery in a prime Pennsylvania Avenue location, is one such restaurant affected.  Since early March 2020, GCDC has been complying with orders issued by the District of Columbia that have brought its business to a complete halt.  GCDC filed a claim with its business insurance carrier, the Defendants, and was denied coverage on the basis of indecipherable exclusions and endorsements added unilaterally to its policy.

5.      GCDC and other restaurants similarly situated bought full-spectrum, comprehensive insurance for their *businesses* – not just for damage to their physical premises and equipment.  These restaurants believed that they had comprehensive coverage that would apply to business interruptions under circumstances like these, where they have done everything right to protect their businesses and the public.  Such coverage is important, if not vital, because profit margins in the restaurant industry are slim and reserve funds tend to be low.  Hence, business interruptions are a particular concern of this industry.

6.      Had Defendants wanted to exclude the risks of a pandemic – and the necessary public health counter-measures that would mandate business closures and population-wide social distancing – they should have done so plainly, as they did with numerous other risks.  But they did not.

7.      GCDC brings this action, on behalf of itself and other District of Columbia restaurants similarly situated, seeking declaratory relief, insurance coverage owed under Defendant's policies, and damages.

## JURISDICTION

8.      This Court has subject matter jurisdiction over this action under 28 U.S.C.

§ 1332(d)(2) because this is a class action wherein the amount in controversy exceeds the sum or

value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the

proposed class, and at least one member of the class of Plaintiffs is a citizen of a state different

from at least one Defendant.

9.      This Court has personal jurisdiction over Defendants, because Defendants

conduct business in Washington, D.C.

10.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) as a substantial

part of the events or omissions giving rise to the instant action occurred in Washington, D.C.

## PARTIES

11.     Plaintiff GCDC LLC, d/b/a GCDC Grilled Cheese Bar, is a limited liability

company, formed under the laws of the District of Columbia in September 2012.

12.     Defendant The Hartford Financial Services Group, Inc., a Delaware corporation

with its principal place of business in Hartford, Connecticut, is a business which, at all relevant

times to this instant action, operated in Washington, D.C., including through its subsidiary,

Sentinel Insurance Company, Ltd.

13.     Defendant Sentinel Insurance Company, Ltd., a Connecticut corporation with its

principal place of business in Hartford, Connecticut, is a business which, at all relevant times to

this instant action, operated in Washington, D.C.

## FACTUAL BACKGROUND

14.     In January 2020 early media reports documented an outbreak of a novel strain of

coronavirus – COVID-19 – in Wuhan, China.  By late January, it was generally understood in

the scientific and public health communities that COVID-19 was spreading through human-to-human transmission and could be transmitted by asymptomatic carriers.

15.     On January 30, 2020, reports of the spread of COVID-19 outside China prompted the World Health Organization to declare the COVID-19 outbreak a "Public Health Emergency of International Concern."

16.     On March 11, the World Health Organization declared COVID-19 a global health pandemic based on existing and projected infection and death rates and concerns about the speed of transmission and ultimate reach of this virus.

17.     Public health officials have recognized for decades that non-pharmaceutical interventions (NPIs) can slow and stop the transmission of certain diseases.  Among these are screening and testing of potentially infected persons; contact tracing and quarantining infected persons; personal protection and prevention; and social distancing.  Social distancing is the maintenance of physical space between people.  Social distancing can be limited – *e.g.*, reducing certain types of conduct or activities like hand-shaking – or large-scale – *e.g.*, restricting the movements of the total population.

18.     A lack of central planning, shortages of key medical supplies and equipment, and the unfortunate spread of misinformation and disinformation about the risks of COVID-19 has led to widespread confusion, unrest, and uncertainty regarding the likely trajectory of this pandemic and the appropriate counter-measures necessary to mitigate the damage it could potentially cause.

19.     Beginning in late February, public health officials began advising various governments around the world that one of the most disruptive NPIs – population-wide social distancing – was needed to stop the transmission of COVID-19.  Suddenly schools, offices,

public transit, restaurants, and shops -- densely occupied spaces, heavily traveled spaces, and frequently visited spaces – were likely to become hot-spots for local transmission of COVID-19.

20.      By mid-March, that advice was being implemented by state and local governments across the United States.  Throughout March and April, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued a series of orders ("Public Health Orders") placing increasingly stringent limitations on public activities and private gatherings to force social distancing.  In order to comply with these orders, many D.C. businesses, including the businesses in the immediate area of GCDC, were forced to abandon their property and suspend ordinary business activities.

21.      On March 11, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Orders 2020-045 and 2020-046, which declared a Public Emergency and a Public Health Emergency in the District of Columbia. These Orders went into effect immediately and were to remain in effect until at least fifteen (15) days after March 11.

22.      On March 16, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-048, which specifically prohibited gatherings of more than fifty (50) persons as well as table seating at any restaurant in the District of Columbia beginning at 10:00 pm that night until April 1, 2020 at 6:00 am. Order 2020-048 stated that violators would be subject to criminal, civil and administrative penalties, including summary suspension of licensure. This Order went into effect immediately and was to remain in effect at least through March 31, 2020.

23.      On March 20, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-051, which extended the specific prohibition of gatherings of more than fifty (50) persons and on table seating at any restaurant in the District of Columbia,

and, in addition, specifically prohibited service to standing customers. Order 2020-051 stated that violators would be subject to criminal, civil and administrative penalties, including summary suspension of licensure. This Order went into effect immediately and was to remain in effect at least through April 24, 2020.

24.    On March 24, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-053, which mandated closure of all on-site operations of non-essential businesses and specifically prohibited sit-down consumption at any restaurant, as well as any gathering of ten (10) or more persons anywhere. Order 2020-053 stated that violators would be subject to criminal, civil and administrative penalties, including summary suspension or revocation of licensure. This Order went into effect at 10:00 p.m. on March 25, 2020, and was set to remain in effect at least through April 24, 2020.

25.    On March 30, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued a Stay-At-Home Order, ordering all individuals living in Washington, DC, to stay at their place of residence, except to obtain food and essential household goods or to engage in Essential Business Activities.  The Stay-At-Home Order stated that violators would be subject to criminal, civil and administrative penalties, including summary suspension or revocation of licensure. This Order went into effect at 12:01 a.m. on April 1, 2020 and was set to remain in effect through at least April 24, 2020.

26.    On April 8, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-58, which mandated that all restaurants mark six (6) foot distances outside and within their location to manage lines of customers and adopt social distancing requirements similar to those imposed on grocery stores and other retail food sellers, such as maintaining a minimum distance of six (6) feet from each person who is not part of the

same household. This Order went into effect at 12:01 a.m. on April 9, 2020 and was set to remain in effect at least through April 24, 2020.

27.     On April 15, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued Order 2020-063, which extended Order 2020-053 and the Stay-At-Home Order until May 15, 2020.  Order 2020-063 also extended the Public Emergency and Public Health Emergency in the District of Columbia until May 15, 2020. Order 2020-063 stated that violators would be subject to criminal, civil and administrative penalties, including summary suspension or revocation of licensure, and specified that individuals "should call 311 to report any suspected violations of this or other Mayor's Orders related to the COVID-19 public health emergency."  This Order went into effect at 12:01 a.m. on April 17, 2020 and is set to remain in effect at least through May 15, 2020.

## PLAINTIFF'S EXPERIENCE

28.     Plaintiff GCDC Grilled Cheese Bar is a restaurant located in the heart of downtown Washington, D.C.  Opened in April 2014, GCDC is a casual restaurant offering sit-down and take-out options for lunch and table-service for dinner.

29.     Like many urban restaurants, seating is compact; in a space of approximately 2,146 square feet, tables can accommodate approximately 85 diners at one time and, weather permitting, additional sidewalk seating accommodates another 16-20 people.  On a busy day, the restaurant serves up to 350 people.  In addition to patrons, approximately 9-10 staff are on-site during the lunch and dinner shifts; approximately half are in the kitchen working in close proximity to one another and the remainder are interacting with customers.

30.     Since its opening in 2014, GCDC has been successful, steadily increasing its revenues.  Located less than one block from the White House, GCDC is popular with office-

workers, tourists, and neighborhood university students.  While the restaurant has always offered

take-out and delivery services, little revenue – historically,15% – was derived from them.  The

overwhelming majority of patrons prefer to come in and eat with sit-down service.

31.     In response to the District's first COVID-19 Public Health Order, GCDC

modified its floorplan to place diners far apart.  In response to the District's second COVID-19

Public Health Order, GCDC ceased all seated dining.  In addition, GCDC attempted to broaden

its take-out offerings.  Despite these efforts, GCDC experienced a 95% drop in business income

between early March and April 11, 2020.  GCDC closed on April 11, 2020 with an intent to re-

open when permitted and feasible.

32.     GCDC has complied with the District's Public Health Orders.  The impact of

these orders is felt not simply in their direct application to GCDC's operations, but also in their

application to the businesses and properties adjacent to GCDC and across the District.

33.     Even when the District revokes these standing orders, GCDC is likely to

experience residual effects caused by the current reality: that densely occupied public spaces are

thought of as potentially unsafe and that continuing to operate as it had before the introduction of

COVID-19 in the District of Columbia might expose GCDC to the risk of contaminated premises

as well as exposing customers and workers to transmission and infection risks.

34.     GCDC's annual net revenues were approximately $1.475 million in 2018 and

$1.456 million in 2019.  The restaurant expected to reach revenues of $1.6 million this year.  Its

monthly revenues for January and February 2020 were $113,166 and $126,787 respectively and

were expected to rise during the spring and summer months as they had in previous years.

35.     Prior to opening in April 2014, GCDC purchased comprehensive business

insurance –  a Spectrum Business Owner's Policy – from Defendants to insure against all risks

(unless explicitly excluded) a business might face.  The insured risks included losses of and damage to its premises, including loss of use, physical property, data, and business income, as well as covering claims by customers and employees against GCDC.

36.     GCDC's Spectrum Business Owner's Policy, No. 42 SBA BD 2141, is a renewal policy effective from January 1, 2020 to January 1, 2021. GCDC's location in downtown Washington D.C. is the covered property described in the policy declarations.

37.     The terms of the policy were unilaterally set by Defendants and offered on a take-it-or-leave-it basis; subsequent amendments to the original terms – called endorsements – were also unilaterally imposed.

38.     The insuring agreement of the Special Property Coverage Part of the policy pays for direct physical loss of or damage to covered property at the premises described in the declarations caused by or resulting from any covered cause of loss.  Among other things, the policy explicitly provides:

(a)     coverage for physical loss of property that was caused by or resulted from any covered cause of loss;

(b)     coverage for 12 months of business income that is lost due to the necessary suspension of operations caused by a physical loss of property;

(c)     coverage for 30 days of business income that is lost when access to the scheduled premises is prohibited by order of a civil authority as the result of a covered cause of loss;

(d)     coverage for 90 days of extended business income, which pays for lost profits and expenses that continue while a business rebounds from a covered loss that causes an interruption in the business; and

(e)     coverage for business income that is lost due to physical loss at the premises of a

dependent property.

39.     Covered causes of loss under the policy include the *risk* of direct physical loss.

40.     The policy explicitly excludes a variety of named risks including: earth

movement; government seizure and destruction; nuclear hazard; power failure; war and military

action; water damage caused by flood, mudslide, earthquake and volcanic eruption; neglect and

more.  The policy also includes an endorsement naming "Perils Specifically Excepted" which

lists (A) "Acts Errors or Omissions" pertaining to activities like planning, zoning, developing,

surveying, and other activities related to construction and maintenance; and (B) "Collapse,

'Cracking,' or 'Shifting'" of buildings, structures, facilities, and/or their parts.

41.     The policy provides $1 million in coverage for each occurrence, and aggregate

coverage under the policy is $2 million, and pays actual losses sustained for the business income

and extra expense coverage.

42.     GCDC has paid all of the premiums required by Defendants to keep its policy in

full force.  These premiums have totaled more than $108,000 to date.

43.     GCDC filed a notice of loss report on March 23, 2020, seeking coverage for lost

business income.

44.     On March 25, 2020, without any investigation or inquiry, Defendants denied

GCDC's claim for direct physical loss of property and actual loss of business income sustained

during the suspension of operations as a result of the loss of the use of property.  Defendants

cited numerous grounds for denying coverage, including:

(a)     The Insured did not identify any direct physical loss to any property at a

scheduled premise, leaving the insuring agreement unfulfilled.

(b)     The additional coverage for business income does not provide coverage for the Insured's claim "because there has been no physical loss or damage caused by or resulting from a Covered Cause of Loss to property at the scheduled premises."

(c)     The additional coverage for civil authority does not provide coverage for the Insured's claim because Defendants claim to "have no information to indicate that a civil authority issued an order as a direct result of a covered cause of loss to property in the immediate area of your scheduled premises; accordingly, this additional coverage is not available for your claimed loss of business income."

(d)     The pollution exclusion excludes coverage, as "[t]he coronavirus is understood to be an irritant or contaminant which causes or threatens to cause physical impurity, unwholesomeness and threatens human health or welfare."

(e)     The Limited Fungi, Bacteria or Virus Coverage Endorsement precludes coverage for loss or damage caused directly or indirectly by presence, growth, proliferation, spread or any activity of virus unless the virus results in a 'specified cause of loss' and "[a]s we understand your loss, the virus has not resulted in a specified cause of loss and there is no coverage for you claim based on the exclusion for virus."

45.     Defendants' denial letter appears to be a form letter prepared to send in response to business interruption claims arising from DC's Public Health Orders by customers who purchased the same or substantially similar comprehensive business insurance policies.

## CLASS ALLEGATIONS

46.     Plaintiff re-alleges and incorporates by reference herein all of the allegations contained above.

47.     Business insurance policies purchased by small businesses like restaurants are not individually negotiated.  At most, the prospective policyholder may elect to add specialized coverage options to a basic business insurance policy.  But the substantive terms are set unilaterally by the insurer.

48.     Plaintiff's Spectrum Business Owner's Policy includes common terms and phrases widely used by the insurance industry.  The insurance industry typically hews closely to standardized insurance policy forms in addressing property and liability risks, and Defendants did so here.

49.     As the impact of the COVID-19 pandemic is emerging, leading insurance industry associations have publicly stated that such standard business insurance policies do not provide any coverage for the business losses related to public health orders like those published by the District of Columbia.  The denial letter received by Plaintiff—issued without any investigation two days after a claim was filed—appears to be a form letter that, on information and belief, is sent automatically to any restaurant with comprehensive business insurance that files a claim at this time.

50.     Pursuant to the Fed. R. Civ. P. 23(b)(2), 23(b)(3), and 23(c)(4), Plaintiff brings this action on behalf of itself and the following Class (the "Class"):  All restaurants in Washington, D.C. that purchased comprehensive business insurance coverage from Defendants which includes coverage for business interruption, filed a claim for lost business income following the District's publication of its Public Health Orders, and were denied coverage by Defendants.

51.     Excluded from the Class are the Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors,

subsidiaries, and assigns. Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

52.     This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements.

53.     Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

54.     Although the precise number of members of the Class is unknown and can only be determined through appropriate discovery, Plaintiff believes, and on that basis alleges, that the members of the proposed Class are so numerous that joinder of all members would be impracticable.  There are approximately 2,457 restaurants in the District of Columbia.  The local and national media are reporting that thousands of businesses have had insurance claims denied for the loss or damage to physical property and for the actual loss of business income sustained during the suspension of operations as a result of the loss of use of the property following orders like the District's Public Health Orders.

55.     Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including *inter alia*:

(a)     Whether Defendants' comprehensive business insurance policies cover claims for lost business income under the circumstances present here;

(b)     Whether the terms, definitions, and exclusions that Defendants have relied on to deny coverage are contradictory or ambiguous and therefore should not be construed against policyholders;

(c)     Whether the Limited Fungi, Bacteria, or Virus Coverage Endorsement is

enforceable;

(d)     Whether Defendants breached the implied covenant of good faith and fair dealing

in obscuring policy exclusions or unilaterally amending their policies to exclude

coverage for business income under the circumstances presented here;

(e)     Whether Defendants acted in bad faith in denying claims for lost business income

without investigation or due consideration of those claims; and

(f)     Whether the declaratory judgment sought is appropriate.

56.     Plaintiff is a member of the putative Class.  The claims asserted by the Plaintiff in

this action are typical of the claims of the members of the putative Class as the claims arise from

the same course of conduct by Defendants and the relief sought is common.

57.     Plaintiff will fairly and adequately represent and protect the interests of the

members of the putative Class, as its interests coincide with, and are not antagonistic to, the other

members of the Class.  Plaintiff has retained counsel competent and experienced in both

consumer protection, insurance coverage, and class action litigation.

58.     Certification of the Class is appropriate pursuant to Fed. R. Civ. P. 23 (b)(3)

because:

(a)     Questions of law or fact common to the respective members of the Class

predominate over questions of law or fact affecting only individual members.

This predominance makes class litigation superior to any other method available

for the fair and efficient adjudication of these claims including consistency of

adjudications.  Absent a class action it would be highly unlikely that the members

of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

(b)     A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden of the courts that individual actions would create.

(c)     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

59.     The Class should also be certified pursuant to Fed. R. Civ. P. 23(b)(2) because:

(a)     The prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Defendants.

(b)     The prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests.

(c)     Defendants have acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

60.     Likewise, particular issues are appropriate for certification under Fed. R. Civ.

P. 23(c)(4) because such claims present only particular, common issues, the resolution of which

would advance the disposition of this matter and the parties' interests therein. Such particular

issues include, but are not limited to:

(a)     Whether the comprehensive business insurance policies issued by Defendants

cover class members' direct physical loss of property and lost business income

following the District's Public Health Orders;

(b)     Whether the coverages for direct physical loss of property and lost business

income provided by the comprehensive business insurance policies are precluded

by exclusions or other limitations in those policies;

(c)     Whether Defendants breached their contracts by denying comprehensive business

insurance coverage to Plaintiff and Class members;

(d)     Whether summary denial of claims for direct physical loss of property and lost

business income without any investigation or inquiry constitutes bad faith and

therefore a breach of the implied covenant of good faith and fair dealing to act in

good faith and with reasonable efforts to perform their contractual duties and not

to impair the rights of other parties to receive the rights, benefits, and reasonable

expectations under the contracts;

(e)     Whether the sale of these policies with the knowledge that Defendants would not

provide coverage for business interruptions associated with public health counter-

measures constitutes a breach of the implied covenant of good faith and fair

dealing.

(f)     Whether Plaintiff and the Class members are entitled to actual damages and/or

injunctive relief as a result of Defendants' wrongful conduct.

## COUNT I:  DECLARATORY JUDGMENT

61.     Plaintiff re-alleges and incorporates by reference herein all the allegations

contained in paragraphs 1 through 60.

62.     Plaintiff purchased a comprehensive business insurance policy from Defendants.

63.     Plaintiff paid all premiums required to maintain its comprehensive business

insurance policy in full force.

64.     The comprehensive business insurance policy includes provisions that provide

coverage for the direct physical loss of use of its premises and equipment as well as actual loss of

business income and extra expenses sustained during the suspension of operations as a result of

the loss of use and risk of physical loss.

65.     In March and April 2020, the District of Columbia issued a series of Public

Health Orders that severely restricted access to Plaintiff's business premises.

66.     These Public Health Orders also applied to the businesses, schools, museums, and

public attractions immediately surrounding Plaintiff's business premises and to residents of and

visitors to the District of Columbia.

67.     As a result of the District's Public Health Orders, Plaintiff lost the use of its

business property and lost substantial business income as a result of the loss of the use of its

business property.

68.     These losses are insured losses under several provisions of Plaintiff's

comprehensive business insurance policy including provisions covering direct loss of property,

loss of business income, extended loss of business income, and business income from dependent properties.

69.     There are no applicable, enforceable exclusions or definitions in the insurance policies that preclude coverage for these losses.

70.     WHEREFORE, Plaintiff seeks a declaration for itself and similarly situated restaurants that its business income losses are covered and not precluded by exclusions or other limitations in its comprehensive business insurance policy.

## COUNT II:  BREACH OF CONTRACT

71.     Plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 60.

72.     Plaintiff and Class members purchased comprehensive business insurance policies from Defendants to ensure against all risks (unless specifically excluded) a business might face. These policies were binding contracts that afforded Plaintiff and Class members comprehensive business insurance under the terms and conditions of the policies.

73.     Plaintiff and Class members met all or substantially all of their contractual obligations, including paying all the premiums required by Defendants.

74.     Beginning on March 16, 2020, the District of Columbia, through the Office of the Mayor Muriel Bowser, issued a series of Public Health Orders.  As detailed above, in paragraphs 22 through 27, these Orders ultimately banned gatherings of more than ten (10) people; prohibited table seating, sit-down consumption, and standing service at restaurants; closed all non-essential businesses; ordered all Washington, D.C. residents to stay at their place of residence, except to obtain food and essential household goods or to engage in Essential Business Activities; and required restaurants to adopt social distancing measures similar to those

imposed on grocery stores and other retail food sellers, such as maintaining a minimum distance of six (6) feet from each person who is not part of the same household. As of the date of the filing of this Complaint, these mandates from the District's Public Health Orders remain in effect until at least May 15, 2020.

75.     Beginning with March 16, 2020 and continuing through the date of the filing of this Complaint, Plaintiff and Class members suffered the direct physical loss of property and lost business income following the District's Public Health Orders, which were covered under the comprehensive business insurance policies purchased from Defendants.

76.     There are no applicable, enforceable exclusions in Plaintiff's and Class members' comprehensive business insurance policies that preclude coverage.

77.     Defendants breached their contracts by denying comprehensive business insurance coverage to Plaintiff and Class members.

78.     As a direct and proximate result of Defendants' denial of comprehensive business insurance coverage to Plaintiff and Class members, Plaintiff and Class members suffered damages.

79.     WHEREFORE, Plaintiff seeks: (a) a judgment for itself and similarly situated restaurants that Defendants have breached their contracts with Plaintiff and members of the putative class;  and (b) corresponding damages for that breach.

## COUNT III:  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

80.     Plaintiff re-alleges and incorporates by reference herein all the allegations contained in paragraphs 1 through 60.

81. Plaintiff and Class members contracted with Defendants to provide them with comprehensive business insurance to ensure against all risks (unless specifically excluded) a business might face.

82. These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties—both explicit and fairly implied—and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts.  These included the covenants that Defendants would act fairly and in good faith in carrying out their contractual obligations to provide Plaintiff and Class members with comprehensive business insurance.

83.  Defendants breached the implied covenant of good faith and fair dealing by:

(a) Selling policies that appear to provide liberal coverage for loss of property and lost business income knowing that Defendants would interpret poorly defined terms, undefined terms, and ambiguously written exclusions to deny coverage under circumstances foreseen by Defendants;

(b) Denying coverage for loss of property and lost business income by invoking undefined, ambiguous, and contradictory terms that are inconsistent with the plain terms and purpose of the policy;

(c) Denying Plaintiff and Class members' claims for loss of property and loss of business income without adequate investigation or inquiry, arbitrarily and capriciously, and/or with knowledge that the denial was unreasonable under the policy.

84. Plaintiff and Class members met all or substantially all of their contractual obligations, including by paying all the premiums required by Defendants.

85.     Defendants' failure to act in good faith in providing comprehensive business insurance coverage to Plaintiff and Class members denied Plaintiffs and Class members the full benefit of their bargain.

86.     Accordingly, Plaintiff and Class members have been injured as a result of Defendants' breach of the covenant of good faith and fair dealing and are entitled to damages in an amount to be proven at trial.

87.     WHEREFORE, Plaintiff seeks: (a) a judgment for itself and similarly situated restaurants that Defendants have breached the covenant of good faith and fair dealing implied in their contracts with Plaintiff and members of the putative class; and (b) corresponding damages for that breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff GCDC LLC, on behalf of itself and the Class, seeks the following relief:

(a)     An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing Cohen Milstein Sellers & Toll PLLC and Gibbs Law Group LLP, as Class Counsel, and finding that Plaintiff is a proper representative of the Class requested herein.

(b)     A declaration that Plaintiff's and Class members' losses are covered under Defendants' comprehensive business insurance policies;

(c)     Plaintiff also requests damages, attorneys' fees and costs, and such other and further relief as is just and proper as compensation for Defendants' breach of contract and breach of the implied covenant of good faith and fair dealing.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury in this action of all issues so triable.

April 27, 2020

Respectfully submitted,

*/s/ Andrew N. Friedman*

Andrew N. Friedman (DC Bar 375595)
Victoria S. Nugent (DC Bar 470800)
Julie Selesnick (DC Bar 485558)
Geoffrey Graber (*pro hac vice forthcoming*)
Eric Kafka (*pro hac vice forthcoming*)
Karina G. Puttieva (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
afriedman@cohenmilstein.com
vnugent@cohenmilstein.com
jselesnick@cohenmilstein.com
ggraber@cohenmilstein.com
ekafka@cohenmilstein.com
kputtieva@cohenmilstein.com

Eric H. Gibbs (*pro hac vice forthcoming*)
ehg@classlawgroup.com
Andre M. Mura (DC Bar 492837)
amm@classlawgroup.com
Karen Barth Menzies (*pro hac vice forthcoming*)
kbm@classlawgroup.com
Amy M. Zeman (*pro hac vice forthcoming*)
amz@classlawgroup.com
Steve Lopez (*pro hac vice forthcoming*)
sal@classlawgroup.com
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

*Attorneys for Plaintiff and Proposed Class*